# Richmond

ISLAND CREEK COAL COMPANY, ET AL.

V.

LEONARD MCKINLEY MILLER

June 18, 1982.

Record No. 811126.

Present: All the Justices.

*Thomas R. Scott, Jr. (Street, Street, Street, Scott & Bowman,* on brief), for appellants.

*Larry Grant Browning (Browning, Morefield, Schelin and Arrington, P.C.,* on brief), for appellee.

POFF, J., delivered the opinion of the Court.

Island Creek Coal Company and its insurance carrier, Old Republic Insurance Company, appeal from an award of workmen's compensation benefits to Leonard McKinley Miller. The Industrial Commission's award was based upon the findings of fact and conclusions of law stated in the hearing commissioner's opinion. The employer challenges the Commission's finding of causal connection.

On August 31, 1979, Miller, one of Island Creek's foremen, suffered an industrial injury to his right knee. The next day, he was examined by Dr. Emile Khuri, a general surgeon. Finding the knee swollen and tender, Dr. Khuri attempted an aspiration, but no fluid was extracted and Miller returned to work.

Several weeks later, Miller was examined by Dr. W. T. Henderson, an orthopedic surgeon. The attending physician's report dated September 21, 1979 (hereinafter, the 1979 report), stated that Miller's condition was diagnosed as "[t]ear of right medial meniscus" resulting from the industrial accident and that the knee had a tendency to "lock". Dr. Henderson advised Miller to attempt to continue working but to return "in a few days for possible surgical consideration."

Miller's family physician, who had been treating him for a urinary complication, advised against surgery. Miller decided to follow this advice, resumed his regular duties, and sought no further medical attention until nearly a year later when he was hospitalized for injuries sustained in an "altercation" at a "bluegrass festival". According to Dr. Giles Gilmer's discharge summary, Miller was admitted to the hospital on August 30, 1980; "[o]n the second hospital day he was alert and complained of pain in the right knee"; "[a]bout 60 ccs. of blood was aspirated"; "[t]he knee continued to have pain and swelled again"; and "[h]e was discharged 9-3-80 with the use of crutches and instructions to see an orthopedist".

Later the same day, Miller returned to Dr. Henderson, who decided to operate on the knee. Henderson's discharge summary

stated that "the torn right medial meniscus was removed" and a "fracture of lip of the medial plateau of tibia was noted." Dr. Henderson concluded that Miller "sustained a 10% loss of function of his right leg."

Miller filed a claim for medical and disability benefits based upon the 1979 industrial accident. Ervin B. Davis, claims manager for Old Republic, addressed a letter to Dr. Henderson advising him that Miller had been injured in the altercation and requesting his opinion whether Miller's disability was causally related to the industrial accident. Davis enclosed copies of Dr. Gilmer's records, and, in a note appended to the letter, he said, "I would appreciate it very much if I could discuss this case with you on the telephone."

Replying by letter dated February 2, 1981 (hereinafter, the 1981 letter), Dr. Henderson said that he "was not aware" that Miller had sustained the injuries Davis described; that, at the time of the industrial accident "it was thought that he may have a damaged medial meniscus in his right knee"; that Dr. Gilmer's report that Miller's knee had been successfully aspirated following the altercation "would indicate that there was a fresh injury to the knee"; that the fracture discovered during surgery was "a recent injury"; that "the damaged meniscus was a result of the physical altercation . . . and was in no wise related to the old injury"; and that "[a]ny persisting disability . . . would be related to the incident of August 30, 1980 and unrelated to the incident of August 31, 1979."

Miller testified at the hearing that, following his accident in 1979, he had worked regularly in spite of continuing trouble with his knee; that "[i]t swelled up on me every night after work"; that "on the average once a week it would lock up"; that he "used [crutches] at home a lot of the time"; and that "a lot of times I would have to stop [my car] and get out and walk and stretch my leg it was cramping me to death." Miller said that his leg was swollen and "as sore as it could be before I ever left the house" to attend the festival. Asked if he had injured his leg during the altercation, he replied, "No sir, not that I know of. It may have give away on me and made me fall, I don't know about that." Miller admitted that he was "very much" intoxicated at the time.

During the course of the hearing, counsel agreed to depose Dr. Henderson for the record. He explained that the opinion expressed in his letter was based upon information Davis had supplied in his

letter and in a telephone conversation, upon Dr. Gilmer's successful aspiration of the knee, upon the fracture discovered during surgery, and upon the fact that Miller had worked without further medical attention for nearly a year following the industrial accident. Surgery was not performed at that time, he said, because "I wasn't that certain as to the diagnosis." Asked if he would "be inclined to think that the surgery was related to the first injury" if Miller's testimony concerning the symptoms he suffered at work was true, Dr. Henderson replied, "I would say that it would be possible." He also agreed that it was medically possible that blood could collect in the injured knee if Miller "had kept on working" as he said he had. On cross-examination, Dr. Henderson acknowledged that the reason Dr. Khuri's attempt to aspirate the knee produced no fluid was "either that he stuck him in the wrong place or else there was not enough fluid present".

The hearing commissioner found that Dr. Henderson's 1981 letter was "somewhat equivocal . . . with reference to the diagnosis" he made in his 1979 report; that the 1979 report "does not include any qualification of the diagnosis"; and that it is "illogical for Dr. Henderson to assert in February of 1981 that the damaged meniscus was a result of a physical altercation in August of 1980 when he is on record as stating that the damaged meniscus was causally related to an August 1979 industrial accident." Upon these findings, the commissioner concluded that Miller's disability "is causally related to his original industrial accident", and the full Commission agreed.

On brief, the employer contends that the Commission erred in resting its award "solely on the basis of [the 1979 report], notwithstanding the fact that [the 1981 letter] and deposition . . . superseded and retracted [the 1979 report] and unequivocally related claimant's injury and ensuing disability to his subsequent non-industrial accident". As phrased by the employer at bar, the ultimate issue on appeal is whether there was credible evidence to support the finding of causal connection. We believe there was.

Miller's disability resulted from a "tear of right medial meniscus". The only question the Commission was required to decide was whether that injury resulted from the industrial accident or the altercation at the festival. In his 1979 report, Dr. Henderson stated unconditionally that Miller had suffered a torn meniscus as a result of the industrial accident. The symptoms Dr. Khuri observed were consistent with those upon which Dr. Henderson

based his diagnosis, and, as Dr. Henderson acknowledged on cross-examination, Dr. Khuri's failure to extract fluid was not necessarily inconsistent with the diagnosis Dr. Henderson made at that time.

Nor did the fact that Dr. Gilmer's aspiration was successful necessarily prove that the torn meniscus was unrelated to the industrial accident. In his deposition, Dr. Henderson conceded that blood could collect in the injured knee if Miller continued to work at his job. Miller's testimony describing the symptoms he experienced at work reinforces Dr. Henderson's 1979 diagnosis. Those symptoms were recurrent, persistent, and still present, Miller said, when he left his home to attend the festival. Miller denied that his knee was injured in the altercation, and Dr. Gilmer's report shows that he made no complaint of pain in the joint until the second day.

The employer interprets Dr. Henderson's 1981 conclusions as a categorical retraction of his 1979 diagnosis. True, in reply to Davis's letter, Dr. Henderson expressed the opinion that the torn meniscus "was in no wise related to the old injury", and this opinion contradicts his original opinion. But, as noted above, Dr. Henderson later acknowledged on deposition that "it would be possible" that the pain, swelling, cramps, and knee locks Miller experienced were symptomatic of the injury diagnosed in the 1979 report. If Dr. Henderson's letter was a retraction of that diagnosis, his deposition was a qualification of the retraction.

Hence, the Commission was faced with internal conflict in the expert evidence of the claimant's attending physician. In the process of resolving that conflict, the Commission quite properly considered the medical reports of other doctors and the lay testimony of the claimant. Reviewing the record as a whole, we cannot say as a matter of law that there was no credible evidence to support the Commission's findings, and we will affirm its award.

*Affirmed.*