## Salem

MERILLAT INDUSTRIES, INC., et al.

v.

CARTER McKINNON PARKS

No. 0222-91-3

Decided September 1, 1992

COUNSEL

John E. Kieffer (Woodward, Miles & Flannagan, P.C., on brief), for appellants.

Gerald F. Sharp (J. D. Morefield; Browning, Morefield, Lamie & Sharp, P.C., on brief), for appellee.

OPINION

**ELDER, J.**—Merillat Industries, Inc., and Michigan Mutual Insurance Co. (appellants) appeal from an award by the Industrial Commission compensating Carter McKinnon Parks (claimant) for temporary total work incapacity beginning September 15, 1989, and continuing. Appellants assert (1) that the commission erred in entering an award based on an "occupational disease," when as a matter of law there was not a disease but instead a noncompensable cumulative injury, and (2) that no credible evidence supported the commission's conclusion that there was an occupational disease. We find no merit in the arguments urged on us by appellants and affirm the commission's decision.[1]

---

[1] An unpublished memorandum opinion was released in this case on March 31, 1992. Said opinion was withdrawn by this Court on April 17, 1992, prior to the issuance of the Court's mandate. The withdrawal was caused by an opinion which was to be published by another panel of this Court which involved similar issues. *See Holly Farms Foods, Inc. v. Carter*, 15 Va. App. 29, 422 S.E.2d 165 (1992).

On January 10, 1981, while employed as a maintenance mechanic at Merillat, claimant suffered the permanent loss of the use of his right hand and received temporary total compensation benefits through April 14, 1986, the day he returned to Merillat to work as a "wire hanger." Claimant's new position required him to remove from a conveyor belt bundled wire hangers and doors weighing up to twenty-five pounds. It also involved repetitive overhead lifting. He held the job until September 6, 1989, when he stopped working due to pain in his left shoulder and chest area.

Claimant consulted a series of medical specialists about his shoulder. After examining him, two orthopedists reached similar conclusions. Dr. Larry G. Lipscomb diagnosed claimant as having "an impingement syndrome and in all probability [a] rotator cuff tear." Dr. Melvin L. Heiman found "a typical impingement problem with AC joint arthritis and roughening of the rotator cuff." A cardiologist, Dr. Harrison D. Turner, ruled out cardiovascular problems as the cause of the pain. Concluding that the problem was of a musculoskeletal nature, Dr. Turner recommended that claimant be medically retired in order to prevent "further injury to the area."

Claimant filed a claim for an occupational disease of his left shoulder, asking for a finding of temporary total work incapacity beginning September 15, 1989, and continuing.

Dr. Heiman, one of the two orthopedists who examined claimant, diagnosed his condition as "an occupational disease." Dr. Heiman also reported that "[t]his type of illness is not a disease such as cancer, but is in fact an overuse syndrome related to the type of employment Mr. Parks was engaged in." The second orthopedist, Dr. Lipscomb, stated that he "would put it into the injury category." Merillat's counsel submitted medical records to other orthopedists. Dr. William A. McIlwain determined from these records that claimant had suffered not from a disease but from an "injury from repetitive use." Dr. Joseph K. Maloy concluded that claimant had suffered not from a disease but from "stress disorder." Neither Dr. McIlwain nor Dr. Maloy examined claimant personally.

In its opinion of January 11, 1991, the commission reasoned that claimant suffered from an occupational disease.[2] The commission stated

> [a]s the parties are aware, the Commission has awarded numerous cases of carpal tunnel syndrome as an occupational disease depending on the evidence, and we have a problem distinguishing this claimant's rotator cuff tear or impingement syndrome from a carpal tunnel syndrome that has developed through repetitive motions.

The commission further noted that "[t]here is no evidence in the record of the claimant's activity outside of the employment contributing to his shoulder problems."

Appellants assert that the commission erred when it entered an award based on an "occupational disease," when as a matter of law there was no disease but, instead, a noncompensable cumulative injury.

The commission's reliance on cases in which a claimant suffering from carpal tunnel syndrome was found to have sustained an occupational disease can be traced to the holding of this Court in *Knott v. Blue Bell, Inc.*, 7 Va. App. 335, 373 S.E.2d 481 (1988). In *Knott*, we held that, once each of the six conditions set out in Code § 65.1-46

---

[2] Code § 65.1-46 (now Code § 65.2-400), which defines the term "occupational disease," provides in pertinent part:

As used in this Act, unless the context clearly indicates otherwise, the term "occupational disease" means a disease arising out of and in the course of employment, *but not an ordinary disease of life* to which the general public is exposed outside of the employment.

\* \* \*

A disease shall be deemed to arise out of the employment only if there is apparent to the rational mind, upon consideration of all the circumstances:

(1) A direct causal connection between the conditions under which work is performed and the occupational disease,

(2) It can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment,

(3) It can be fairly traced to the employment as the proximate cause,

(4) It is neither a disease to which an employee may have had substantial exposure outside of the employment, nor any condition of the neck, back or spinal column,

(5) It is incidental to the character of the business and not independent of the relation of employer and employee, and

(6) It had its origin in a risk connected with the employment and flowed from that source as a natural consequence, though it need not have been foreseen or expected before its contraction.

(now Code § 65.2-400) has been met, the commission may conclude that a claimant's carpal tunnel syndrome is an occupational disease. However, because our holding in *Knott* flowed from an "examination of Code § 65.1-46 as it appeared prior to the legislative changes effective July 1, 1986," *id.* at 337, 373 S.E.2d at 482, and because of the consequential impact of those legislative changes, we must address anew the question whether a condition gradually incurred as a result of repeated work-related trauma may be deemed an occupational disease under the Workers' Compensation Act.

## I.

Claims for compensation for an occupational disease arising after the General Assembly revised the statutory definitions of both an occupational disease and an ordinary disease of life will be determined by those new definitions, as well as the legislative intent that spawned them. To identify that intent, we set the 1986 revisions in their historical context.

In *Western Electric Co. v. Gilliam*, 229 Va. 245, 329 S.E.2d 13 (1985), the Virginia Supreme Court reversed a finding by the Industrial Commission that a claimant's tenosynovitis was an occupational disease. Tenosynovitis, an overuse syndrome in this instance, resulted from "repeated, work-related trauma." *Id.* at 247, 329 S.E.2d at 14. The Court accepted the commission's "factual finding" that tenosynovitis is a disease. *Id.* However, interpreting the statutory provisions in effect prior to the changes of July 1, 1986, it ruled that a disease "gradually-incurred on account of repeated, work-related trauma" is not an occupational disease but an ordinary disease of life. *Id.* Thus, under the statutory definitions then in effect, the condition was not compensable. *Id.*

While the Court in *Gilliam* accepted "the factual finding" by the commission that the claimant's tenosynovitis was a disease as opposed to an injury,[3] it rejected the commission's finding that this disease was

---

[3] It is significant that the Supreme Court did not reject the commission's finding that the condition at issue was a disease. By contrast, just six months earlier, in *Holly Farms v. Yancey*, 228 Va. 337, 321 S.E.2d 298 (1984), the Court rejected outright a finding by the commission that a claimant's back strain was a disease. In so holding, the Court in *Yancey* relied on fifty years of case history in which back strains, such as those complained of by the claimant, had been treated "as injuries, not as diseases." *Id.* at 340-41, 321 S.E.2d at 300. In other words, in view of the case history governing back strains, courts were not free to treat a "[s]train of the muscles or tendons in the back . . . due to a single or repeated . . . trauma" as a disease. *Id.* at 340, 321 S.E.2d at 300. Nonetheless, as *Gilliam* suggests, the Industrial Commission *was* free to make a

"occupational." Instead, a disease "which had its origin in repeated, work-related trauma, was an ordinary disease of life." *Gilliam,* 229 Va. at 247, 329 S.E.2d at 14 (footnote omitted). However, interpreting "legislative intent as reflected in the totality of the Workers' Compensation Act *as it exists today,*" *id.* (emphasis in original) (footnote omitted), the Court expressed a reluctance to hold that the Act extended compensation to disabilities resulting from "diseases caused gradually by repeated trauma." *Id.* at 247-48, 329 S.E.2d at 14.

> [S]uch a consequential decision, impacting as it must a broad spectrum of economic and social values, is a matter of public policy reserved to the original and exclusive jurisdiction of the General Assembly, and we will not trespass on its domain.

*Id.* at 248, 329 S.E.2d at 15.

## II.

In the wake of *Gilliam,* a joint subcommittee comprised of members of the House Committee on Labor and Commerce and members of the Senate Committee on Commerce and Labor reviewed the Workers' Compensation Act with an eye to possible revision. The central question addressed in a series of meetings held in 1985 and 1986 was "whether the Supreme Court reasonably interpreted the definition of 'occupational disease' in *Gilliam.*" H. Doc. No. 27, at 3 (1986). From these discussions emerged revisions to the statutory definitions of "occupational disease" and "ordinary disease of life."

A report tracing the history of the subcommittee's work, and creating the context in which the eventual revisions must be understood, set out the various alternatives considered by the subcommittee. Among these was an amendment

> which would exempt any conditions originating or arising within the muscular, ligamentous, or skeletal system so as to draw a line where the Supreme Court makes its determinations in cases involving such systems. It was explained that this would eliminate "wear and tear" conditions.

H. Doc. No. 27, at 8 (1986). The joint subcommittee in fact proposed such an amendment. In its final recommendations it expressly favored language exempting from coverage "any conditions originating or

---

"factual finding" that a condition not involving back strain, but "gradually-incurred on account of repeated work-related trauma," was a disease. 229 Va. at 247, 329 S.E.2d at 14.

arising within the muscular, ligamentous, or skeletal system'' over less restrictive language exempting only ''conditions of the neck, back or spinal column.'' The subcommittee felt that, were it to recommend less restrictive language, the proposed bill ''would put the Industrial Commission back into the position it was in prior to *Gilliam* yet the joint subcommittee felt that language should be more restrictive.''

The joint subcommittee thus sent a clear message that ''wear and tear conditions'' should be exempt from coverage under the Workers' Compensation Act. Just as clearly, the General Assembly rejected that recommendation when it enacted into law language exempting conditions of the back, neck, and spinal column only. Code § 65.1-46 (now Code § 65.2-400). Understood in light of those background considerations expressly set out in the joint subcommittee's report, the plain intent of the legislature in adopting the less restrictive language was to ''put the Industrial Commission back into the position it was in prior to *Gilliam.*''

During the hearings held before the joint subcommittee, the Industrial Commission summarized its pre-*Gilliam* approach to ordinary diseases of life.

> The Industrial Commission informed the subcommittee that the feeling at the Commission prior to *Gilliam* was that even though a claimant's disease was ''an ordinary disease of life'' it could be compensated if all six conditions specified in § 65.1-46 were met. . . . They pointed out that over the years they have made a conscious effort to show a causal connection between the disease and the work before awarding claims and that they felt the system worked fairly for both the injured employee and the employer.

H. Doc. No. 27, at 5 (1986). Just as the Industrial Commission was guided by the principle of causality, so too will we be guided as we apply the 1986 revisions of the Workers' Compensation Act and interpret the legislative intent that inspired them.

### III.

The revision of Code § 65.1-46 (now Code § 65.2-400), which defines occupational diseases, and the enactment of Code § 65.1-46.1 (now Code § 65.2-401), which identifies those ordinary diseases of

life that may be treated as occupational diseases, introduced new language to govern the compensability of occupational diseases. However, because we hold that claimant's shoulder condition is compensable as an occupational disease under Code § 65.1-46 (now Code § 65.2-400), in the same way that it would have been pre-*Gilliam*, we do not decide whether his condition might also be an ordinary disease of life under Code § 65.1-46.1 (now Code § 65.2-401).

■ In order for a disease to be compensable under Code § 65.1-46 (now Code § 65.2-400), each of six conditions must be met. Only one of these conditions underwent significant revision in 1986. Prior to 1986, Code § 65.1-46(4) read, "It does not come from a hazard to which workmen would have been equally exposed outside of the employment." In 1986, this provision was amended to read, "It is neither a disease to which an employee may have had substantial exposure outside of the employment, nor any condition of the neck, back or spinal column." Code § 65.1-46(4) (now Code § 65.2-400(B)(4)).

■ Following the 1986 amendment, if a claimant's occupational disease may have resulted from substantial exposure outside of the employment, that claimant must meet the more rigorous standard of proof set out in Code § 65.1-46.1 (now Code § 65.2-401).[4] However, where, as here, there is no suggestion that claimant's condition resulted from exposure outside of his employment, we need not look beyond the four corners of Code § 65.1-46 (now Code § 65.2-400).

In *Gilliam*, the Supreme Court held that a disease "which had its origin in repeated, work-related trauma, was an ordinary disease of life." *Gilliam*, 229 Va. at 247, 329 S.E.2d at 14 (footnote omitted). In light of the previous discussion, it is clear that the General Assembly intended to "put the Industrial Commission back into the position it was in prior to *Gilliam*." H. Doc. No. 27, at 8 (1986). Prior to *Gilliam*,

---

[4] Code § 65.1-46.1 (now Code § 65.2-401) allows an "ordinary disease of life," or one "to which the general public is exposed outside of the employment," to be treated as an occupational disease

> if it is established by clear and convincing evidence, to a reasonable medical certainty, that it arose out of and in the course of employment as provided in § 65.1-46 with respect to occupational diseases and did not result from causes outside of the employment, and that:
>
> 1. It follows as an incident of occupational disease as defined in this title; or
>
> . . .
>
> 3. It is characteristic of the employment and was caused by conditions peculiar to such employment.

the Industrial Commission treated wear and tear conditions as occupational diseases, compensable under Code § 65.1-46 (now Code § 65.2-400). Because of the General Assembly's plain intent to revert to the commission's pre-*Gilliam* approach, if a claimant's condition is compensable under Code § 65.1-46 (now Code § 65.2-400), we need not reach the question whether such condition may also be an ordinary disease of life.

## IV.

■ In order to establish that his condition is compensable, a claimant must prove an injury. Code § 65.1-7 (now Code § 65.2-101) defines an injury as either an injury by accident or an occupational disease "arising out of and in the course of the employment," but not including "a disease in any form, except when it results naturally and unavoidably from either of the foregoing causes." Here, claimant's condition is not an injury by accident. *See Morris v. Morris*, 238 Va. 578, 385 S.E.2d 858 (1989) (holding that injuries from repetitive trauma are not injuries by accident).

■ Code § 65.1-46 (now Code § 65.2-400) provides that, in order for an occupational disease to be compensable, each of six factors must be established. *See* note 1, *supra*. In an August 7, 1990, opinion, the deputy commissioner reviewed the history of this case and found that, based on evidence satisfying each of the six conditions set out in Code § 65.1-46 (now Code § 65.2-400), claimant's disease was an occupational disease arising out of and in the course of his employment.

We find that there is a direct causal connection between the conditions under which the work claimant was performing [sic] and the impingement syndrome and rotator cuff tear. The injury claimant has can be seen to have followed as a natural incident of claimant working continuously with one arm occasioned by the nature of the employment. Claimant's condition can be fairly traced to the employment, and the employment is the proximate cause of claimant's condition. This is not a disease or condition to which claimant had substantial exposure outside of the employment, and it is not a condition of the neck, back, or spinal column. It is incidental to the character of the business and not independent of the relation of employer and employee. Claimant's condition had its origin in a risk connected with the employment and flowed from that source as a natural consequence.

The commission expressly upheld these findings.

■ "'Whether a disease is causally related to the employment and not causally related to other factors is . . . a finding of fact.'" *Ross Lab.*, 13 Va. App. at 377, 412 S.E.2d at 208 (quoting *Island Creek Coal Co. v. Breeding*, 6 Va. App. 1, 12, 365 S.E.2d 782, 788 (1988)). "When there is credible evidence to support it, such a finding is 'conclusive and binding' on this court." *Id.* We see nothing in the evidence to undermine the commission's conclusion that claimant's condition flowed from his employment as a natural consequence.

For the foregoing reasons, the decision of the commission is affirmed.

*Affirmed.*

Koontz, C.J., and Coleman, J., concurred.