## Alexandria

HOLLY FARMS FOODS, INC., et al.

v.

MAMIE W. CARTER

No. 1947-91-4

September 1, 1992

COUNSEL

S. Vernon Priddy, III (Sands, Anderson, Marks & Miller, on brief), for appellants.

Kenneth D. Bynum (Koonz, McKenney, Johnson & DePaolis, P.C., on brief), for appellee.

OPINION

**ELDER, J.**—Holly Farms Foods, Inc. and National Union Fire Insurance Company of Pittsburgh, appellants, appeal from a decision of the Workers' Compensation Commission upholding an award of benefits to Mamie W. Carter, claimant. On appeal, appellants assert (1) that claimant failed to prove by clear and convincing evidence that the disease for which she sought benefits constituted an occupational disease under Code §§ 65.1-46 and 65.1-46.1 (now Code §§ 65.2-400 and 65.2-401); (2) that the commission erred in its December 26, 1990, opinion in remanding the matter for the further taking of evidence on the periods of disability as the claimant bears the burden of proving

such periods of disability; (3) that the commission erred in its October 22, 1991, opinion when it refused to consider appellants' assignment of error concerning the correctness of the commission's December 26, 1990, opinion on the ground that such decision had been a final and appealable decision; and (4) that the commission erred in finding that claimant met her obligation to market her residual capacity while only partially disabled. In addition, claimant asserts that this Court is without jurisdiction to review the commission's December 26, 1990, decision, as appellants did not timely appeal from that decision. For the reasons that follow, we affirm the commission's decision.

Claimant worked for Holly Farms as a bagger of whole chickens, often bagging as many as 1300 chickens in an hour. On October 10, 1989, claimant first saw Dr. Gordon Rawles concerning a one-month history of aching in her right hand as well as numbness and tingling extending into her right index finger. Dr. Rawles injected claimant's right carpal tunnel with cortisone and recommended light duty work for two days for "job related carpal tunnel."

Claimant began to experience pain again on October 20, 1989, and two days later visited an emergency room for relief from pain and swelling in both arms. Dr. Rawles diagnosed claimant's injury as "bilateral flexor tendinitis/median nerve entrapment" and renewed his order that claimant perform only light duty work. Two days later, Dr. Rawles stated that claimant was suffering from "an acute myofascial syndrome with no clear focus of the severity." Between October 23, 1989, and November 13, 1989, because Holly Farms had no available light duty work consistent with claimant's restrictions, she unsuccessfully sought work with a number of outside employers. She returned to work at Holly Farms November 14, 1989, but continued to experience bilateral hand and wrist pain. A Holly Farms form dated December 28, 1989, and signed by a Dr. Seitz, indicated that claimant suffered from carpal tunnel syndrome and, though she would require further medical attention, could return to work with limited use of her hand. However, claimant was again told by Holly Farms that no light duty work consistent with her restrictions was available to her. After eight days, during which claimant remained on light duty status, Dr. Rawles returned her to full duty.

In a December 26, 1990 opinion, the commission reversed a deputy commissioner's decision denying claimant benefits and remanded the

case for a determination of compensable periods of disability. In so holding, the commission noted that

> [o]n May 15, 1990, Dr. Rawles, in a handwritten diagnosis, indicated that Carter had flexor tendinitis and Reynaud's syndrome. He added that the two are not related. He recommended permanent limitation with "no repetitive lifting over five pounds at a time, no cutting, no bagging, no handling." He also prescribed medication for the Reynaud's syndrome.
>
> Stephen R. Koller, M.D., specialist in rheumatology to whom Carter was referred by Dr. Rawles, wrote to Dr. Rawles on May 25, 1990:
>
>> I am concerned about the presence of an early systemic rheumatologic syndrome because of her Reynaud's phenomenon and the fact that her wrists were somewhat tender to palpation. However, her tests were normal and an MRI did not show any major abnormality.
>>
>> I suppose we are left with a work related overuse syndrome but only time will tell otherwise. I have not given her another appointment here but am referring her back to you.
>
> From the somewhat conflicting medical reports in this case, we find that Carter contracted a work-related occupational disease, flexor tendinitis, in her right arm and wrist, diagnosis of which was communicated to her on October 22, 1989.
>
> We read the various statements of Dr. Rawles concerning Reynaud's phenomenon as statements that this condition is separate from the flexor tendinitis and median nerve entrapment diagnosed and that it is not related to the overuse stresses encountered by Carter in her work at Holly Farms. We find that the evidence in this record, including the testimony of the witnesses and the medical evidence, clearly establishes by convincing evidence with reasonable medical certainty that the right flexor tendinitis and median nerve entrapment constitute a compensable occupational disease under Code §§ 65.1-46 and 65.1-46.1 of the Act.

As the commission's December 26, 1990, opinion made clear, the commission was unable "to determine from the evidence in this record which periods of disability are claimed and which periods have been compensated by the employer." For this reason alone, the case

was remanded to the deputy commissioner "for the purpose of obtaining pertinent disability information and entry of an appropriate award for disability and medical benefits."

Pursuant to an April 1, 1991, hearing, the deputy commissioner found that claimant was entitled to benefits for the periods of October 23, 1989, through November 13, 1989, and December 28, 1989, through January 4, 1990. The commission affirmed on October 22, 1991, and in so doing refused to consider arguments by appellants concerning the issue of compensability of the occupational disease arising out of its December 26, 1990, opinion. According to the commission, "that Opinion was not appealed and became final on January 26, 1991."

I.

The threshold issue before us is whether the commission's opinion of December 26, 1990, was a final, appealable decision under Virginia law. If it was, appellants may not assert error with respect to any issues finally decided in it.

■ Code § 65.1-98 (now Code § 65.2-706) provides that, with respect to decisions of the Industrial Commission, "[n]o appeal shall be taken from the decision of one commissioner until a review of the case has been had before the full Commission . . . and an award entered by it. Appeals shall lie from such award to the Court of Appeals." In *Jewell Ridge Coal Corp. v. Henderson*, 229 Va. 266, 329 S.E.2d 48 (1985), the Supreme Court wrote that the words " 'such award,' as used in Code § 65.1-98, mean final award, that is, a decision of the Industrial Commission granting or denying, or changing or refusing to change some benefit payable or allowable under the Workers' Compensation Act and *leaving nothing to be done except to superintend ministerially* the execution of the award." *Id*. at 269, 329 S.E.2d at 50 (emphasis added).

The commission's December 26, 1990, determinations do not meet the definition of "final award" set out in *Jewell Ridge*. In its December 26, 1990, opinion, the commission expressly noted that, even though it found a compensable occupational disease, it was unable to "enter an award" due to a lack of evidence identifying periods of disability. Instead, as the commission noted, "[t]his decision is not final until the entry of the award of the Deputy Commissioner establishing

periods of compensable disability." Especially in light of the commission's express recognition that its decision would not become final until the final determination of the periods of disability, we will not conclude that the deputy commissioner's duties on remand were merely "ministerial."

Therefore, in its opinion of October 22, 1991, the commission erred when it held that, because its decision of December 26, 1990, was not appealed, that decision became final on January 26, 1991. The commission's December 26, 1990, opinion did not take final effect until the deputy commissioner identified the periods of disability and entered an award to claimant. The employer appealed that determination, and the commission affirmed the award. In affirming the deputy commissioner's findings concerning the periods of disability, the commission was not, however, required to reconsider the issue of whether claimant had suffered a compensable occupational disease. The full commission does not review its own determinations. We hold that the determination of the commission in its December 26, 1990, opinion was not reviewable by this Court until it became final, an event that occurred on October 22, 1991, when a final award was entered on claimant's behalf.

## II.

Appellants first assert that claimant failed to prove by clear and convincing evidence that the disease for which she sought benefits constituted an occupational disease under Code §§ 65.1-46 and 65.1-46.1 (now Code §§ 65.2-400 and 65.2-401).

## A.

Claims for compensation of a disease arising after 1986, when the General Assembly reviewed and then significantly revised the statutory definitions of both an occupational disease and an ordinary disease of life, will be governed by those new definitions, as well as the legislative intent that spawned them. In order to understand what the legislature intended, it is necessary to begin with consideration of *Western Electric Co. v. Gilliam*, 229 Va. 245, 329 S.E.2d 13 (1985).

In *Gilliam*, the Supreme Court reversed a finding by the Industrial Commission that a claimant's tenosynovitis was an occupational disease. Interpreting the statutory provisions in effect prior to the changes of July 1, 1986, the Court ruled that a disease "gradually-incurred on

account of repeated, work-related trauma" was not an occupational disease but an ordinary disease of life. *Id.* at 247, 329 S.E.2d at 14. Under the statutory definitions then in effect, such a condition was not compensable. *Id.* The Court's holding reflected its reluctance to decide that the Act extended compensation to disabilities resulting from "diseases caused gradually by repeated trauma." *Id.* at 247-48, 329 S.E.2d at 14.

> [S]uch a consequential decision, impacting as it must a broad spectrum of economic and social values, is a matter of public policy reserved to the original and exclusive jurisdiction of the General Assembly, and we will not trespass on its domain.

*Id.* at 248, 329 S.E.2d at 15.

Following *Gilliam*, a joint subcommittee comprised of members of the House Committee on Labor and Commerce and members of the Senate Committee on Commerce and Labor reviewed the Workers' Compensation Act. The central question addressed in a series of meetings held in 1985 and 1986 was "whether the Supreme Court reasonably interpreted the definition of 'occupational disease' in *Gilliam*." H. Doc. No. 27, at 3 (1986). As a result of its work, the subcommittee proposed an amendment to the statutory definition

> which would exempt any conditions originating or arising within the muscular, ligamentous, or skeletal system so as to draw a line where the Supreme Court makes its determinations in cases involving such systems. It was explained that this would eliminate "wear and tear" conditions.

H. Doc. No. 27, at 8 (1986). The subcommittee felt that, were it to recommend less restrictive language, the proposed bill "would put the Industrial Commission back into the position it was in prior to *Gilliam* yet the joint subcommittee felt that language should be more restrictive." *Id.*

The subcommittee thus sent a clear message that "wear and tear conditions" should be exempt from coverage under the Workers' Compensation Act. Just as clearly, the General Assembly rejected that recommendation when it enacted into law language exempting conditions of the back, neck, and spinal column only. Code § 65.1-46 (now Code § 65.2-400). In short, the plain intent of the legislature in adopting the less restrictive language was to "put the Industrial Commission back into the position it was in prior to *Gilliam*."

In hearings before the joint subcommittee, the Industrial Commission summarized its pre-*Gilliam* approach to ordinary diseases of life.

> The Industrial Commission informed the subcommittee that the feeling at the Commission prior to *Gilliam* was that even though a claimant's disease was "an ordinary disease of life" it could be compensated if all six conditions specified in § 65.1-46 were met. . . . They pointed out that over the years they have made a conscious effort to show a causal connection between the disease and the work before awarding claims and that they felt the system worked fairly for both the injured employee and the employer.

H. Doc. No. 27, at 5 (1986). Just as the Industrial Commission was guided by the principle of causality, so too will we be guided by this same principle.

### B.

▪ In order to establish that her condition is compensable, a claimant must prove an injury. Code § 65.1-7 (now Code § 65.2-101) defines an injury as either an injury by accident or an occupational disease "arising out of and in the course of the employment," but not including "a disease in any form, except when it results naturally and unavoidably from either of the foregoing causes." Here, claimant's condition is not an injury by accident. *See Morris v. Morris*, 238 Va. 578, 385 S.E.2d 858 (1989) (holding that injuries from repetitive trauma are not injuries by accident).

▪ In order for a disease to satisfy the statutory definition of "occupational disease" under Code § 65.1-46 (now Code § 65.2-400), each of six conditions must be met.[1] Only one of these conditions was revised in 1986. Prior to 1986, Code § 65.1-46(4) read, "It does not

---

[1] Code § 65.1-46 (now Code § 65.2-400), which defines the term "occupational disease," provides in pertinent part:

> As used in this Act, unless the context clearly indicates otherwise, the term "occupational disease" means a disease arising out of and in the course of employment, but not an ordinary disease of life to which the general public is exposed outside of the employment.
>
> * * *
>
> A disease shall be deemed to arise out of the employment only if there is apparent to the rational mind, upon consideration of all the circumstances:
> (1) A direct causal connection between the conditions under which work is performed and the occupational disease,

come from a hazard to which workmen would have been equally exposed outside of the employment." In 1986, this provision was amended to read, "It is neither a disease to which an employee may have had substantial exposure outside of the employment, nor any condition of the neck, back or spinal column." Code § 65.1-46(4) (now Code § 65.2-400(B)(4)).

In 1986, the legislature enacted Code § 65.1-46.1 (now Code § 65.2-401).[2] Code § 65.1-46.1 (now Code § 65.2-401) identifies ordinary diseases of life that may be treated as occupational diseases. Under this section, an occupational disease that is not compensable under Code § 65.1-46 (now Code § 65.2-400) because of the possibility of substantial exposure outside of employment may still be compensable. However, a claimant must meet a higher standard of proof.

Here, although evidence in the record is conflicting, there is evidence to suggest that conditions outside claimant's employment may have caused the carpal tunnel syndrome. Thus, claimant's evidence must meet the terms of Code § 65.1-46.1 (now Code § 65.2-401).

If a claimant's occupational disease resulted from substantial exposure outside of the employment, her evidence must satisfy a

---

(2) It can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment,

(3) It can be fairly traced to the employment as the proximate cause,

(4) It is neither a disease to which an employee may have had substantial exposure outside of the employment, nor any condition of the neck, back or spinal column,

(5) It is incidental to the character of the business and not independent of the relation of employer and employee, and

(6) It had its origin in a risk connected with the employment and flowed from that source as a natural consequence, though it need not have been foreseen or expected before its contraction.

[2] Code § 65.1-46.1 (now Code § 65.2-401) allows an "ordinary disease of life," or one "to which the general public is exposed outside of the employment," to be treated as an occupational disease

if it is established by clear and convincing evidence, to a reasonable medical certainty, that it arose out of and in the course of employment as provided in § 65.1-46 with respect to occupational diseases and did not result from causes outside of the employment, and that:

1. It follows as an incident of occupational disease as defined in this title; or

\* \* \*

3. It is characteristic of the employment and was caused by conditions peculiar to such employment.

three-pronged test. In order for claimant to be eligible for compensation, she must establish

> that the disease (1) arose out of and in the course of employment, (2) did not result from causes outside of the employment, and (3) follows as an incident of an occupational disease, is an infectious disease or contagious disease contracted in the course of employment, or is characteristic of the employment and was caused by conditions peculiar to the employment.

*Island Creek Coal Co. v. Breeding*, 6 Va. App. 1, 11, 365 S.E.2d 782, 788 (1988) (quoting Code § 65.1-46.1). Moreover, a claimant must establish these three elements " 'by clear and convincing evidence, to a reasonable medical certainty.' " *Id.* However,

> [i]mplicit in the Act's standard that such a determination be made "with reasonable medical certainty" is the recognition that pinpointing a single source for an ordinary disease of life will often be a difficult if not an impossible assignment. Thus, the very standard on which application of the language at issue turns points not to a single source, to the complete exclusion of all other sources, but to the primary source as determined by "reasonable medical certainty."

*Ross Lab. v. Barbour*, 13 Va. App. 373, 377, 412 S.E.2d 205, 208 (1991). Such a determination must be based on evidence that " 'it is at least *more probable than not* that the disease arose out of and in the course of employment.' " *Id.* (quoting *Westmoreland Coal Co. v. Campbell*, 7 Va. App. 217, 223-24, 372 S.E.2d 411, 416 (1988)).

Turning to the first two prongs of the test set out in Code § 65.1-46.1 (now Code § 65.2-401), we note that the chief feature of the medical record is the medical opinion of Dr. J. Gordon Rawles. Dr. Rawles' records include the following findings: that claimant suffered from "job related carpal tunnel;" that she suffered "bilateral flexor tendinitis/median nerve entrapment;" that she had "tenderness laterally, also in the antecubital fossa and down the volar forearms," and that she showed "a Tinel's sign over the median nerve in the forearm as well as in the wrist;" and that she also suffered from "Reynaud's Disease," which apparently Dr. Rawles thought to be "not work-related." The commission interpreted Dr. Rawles' records not as internally conflicting but as indicating that the diagnosed Reynaud's Disease

was separate from the flexor tendinitis, which the commission determined was work-related.

■ In making its determination, the commission apparently relied on the opinion of Dr. Stephen R. Koller, who concluded that claimant suffered from "a work related overuse syndrome." The commission thus resolved questions naturally arising out of Dr. Rawles' various diagnoses and, in this way, reached the conclusion that claimant suffered from a compensable occupational disease. "[I]n those instances where an internal conflict exists in the expert opinion of the claimant's attending physician, it is proper for us to review and consider the other medical opinions in the record to resolve that conflict." *City of Bristol Police Dep't v. Broome*, 7 Va. App. 161, 165-66, 372 S.E.2d 204, 206 (1988) (citing *Island Creek Coal Co. v. Miller*, 223 Va. 645, 292 S.E.2d 328 (1982)). We find that the commission properly followed this principle when it turned to other medical opinions in order to resolve what otherwise might have been an internal conflict among Dr. Rawles' diagnoses.

■ "'Whether a disease is causally related to the employment and not causally related to other factors is . . . a finding of fact.'" *Ross Lab.*, 13 Va. App. at 377, 412 S.E.2d at 208 (quoting *Island Creek Coal Co. v. Breeding*, 6 Va. App. 1, 12, 365 S.E.2d 782, 788 (1988)). "When there is credible evidence to support it, such a finding of facts is 'conclusive and binding' on this Court." *Id.* at 378, 412 S.E.2d at 208. Because the commission's determination that claim-ant's condition was causally related to her employment was supported by credible evidence, we agree that it was "more probable than not," *id.*, that claimant's condition "arose out of and in the course of [her] employment." *Id.*

As for the third prong of the test, it requires, at least with respect to these facts, that claimant's condition be characteristic of the employment and caused by conditions peculiar to the employment. It was not contested that claimant's work duties placed on her unique physical demands that contributed to her condition. We, therefore, need not reach this question.

We uphold the commission's finding that claimant suffered an occupational disease as defined by Code §§ 65.1-46 and 65.1-46.1 (now Code §§ 65.2-400 and 65.2-401).

## III.

Appellants next assert that the commission erred in its December 26, 1990, opinion when it remanded the matter for the taking of further evidence on the periods of disability. Appellants contend the claimant bears the burden of proving such periods of disability as an element of her proof of a claim. The commission did not err in remanding the case to the deputy commissioner for the taking of additional evidence. The deputy's holding on the issue being remanded had been properly appealed and was, as a result, properly before the commission on review.

Here, the deputy commissioner initially denied benefits, a decision properly appealed to the commission. Finding that claimant was entitled to benefits, the commission reversed the deputy commissioner. However, the commission also apparently determined that, because the deputy commissioner had denied claimant benefits and therefore had not reached the issue of periods of disability, additional facts were necessary to allow a final and just determination of periods of disability. As a result, it properly remanded the issue to the deputy commissioner for a determination of compensable periods of disability.

## IV.

Appellants also argue that the commission erred in its October 22, 1991 opinion when it refused to consider appellants' assignment of error concerning the correctness of the commission's December 26, 1990 opinion. The commission held that the December 26, 1990, decision was a final and appealable decision.

As noted, the commission erred when it held that the December 26, 1990 decision was a final and appealable decision. The December 1990 decision was not appealable until the issue of periods of disability had been fully and finally litigated before the Industrial Commission.

Nonetheless, the commission did not err when, in its October 22, 1991, opinion it refused to review its December 1990 determination that claimant was entitled to benefits. It is the role of this Court to review the determinations of the Industrial Commission. Appellants' proper course of action was to wait until final determination of claimant's periods of disability, and then to appeal to this Court both the

issue of entitlement to compensation and the issue of periods of disability. Because those issues are now before us, the commission's error was harmless.

## V.

Finally, appellants assert that the commission erred in finding that claimant met her obligation to market her residual capacity while only partially disabled.

■ A claimant still has the burden of proving his entitlement to benefits, and to do that "he [has] the burden of proving that he [has] made a reasonable effort to procure suitable work but was unable to market his remaining work capacity." *Great Atl. & Pac. Tea Co. v. Bateman,* 4 Va. App. 459, 463-64, 359 S.E.2d 98, 100 (1987) (citation omitted). "In determining whether a claimant has made a reasonable effort to market his remaining work capacity, we view the evidence in the light most favorable to . . . the prevailing party before the commission." *National Linen Serv. v. McGuinn,* 8 Va. App. 267, 270, 380 S.E.2d 31, 33 (1989) (citations omitted).

Here, claimant presented evidence that she sought work from outside employers during her initial twenty-two day period of disability. In an opinion affirmed by the commission, a deputy commissioner held that her efforts were sufficient in light of the brief period of time involved. While claimant made no efforts to secure temporary employment during her second, eight-day period of disability, the deputy commissioner held that it was "unreasonable to expect her to market her residual capacities for such a brief period."

■ The legislative intent behind Code § 65.1-63 (now Code § 65.2-510) has been interpreted as encouraging a disabled employee to make a reasonable effort to market remaining work capacity in order to receive continued workers' compensation benefits. *Washington Metro. Transit Area Auth. v. Harrison,* 228 Va. 598, 601, 324 S.E.2d 654, 656 (1985). The Industrial Commission has, in turn, held that no such effort is required during brief periods of disability. *See, e.g., Dalton v. Tultex Corp.,* 66 O.I.C. 110 (1987); *Younger v. Ennis Business Forms, Inc.,* 66 O.I.C. 114 (1987). Thus, the determinations by the commission that the periods of disability at issue in this case were too brief to allow claimant to market her residual capacity are in harmony with previous commission decisions. "It is well settled that where the construction of a statute has been uniform for many years

in administrative practice, and has been acquiesced in by the General Assembly, such construction is entitled to great weight with the courts." *Dan River Mills, Inc. v. Unemployment Compensation Comm'n*, 195 Va. 997, 1002, 81 S.E.2d 620, 623 (1954).

We find no reason for invalidating the commission's construction of a claimant's duty to market residual capacity.

For the foregoing reasons, the decision of the commission is affirmed.

*Affirmed.*

Moon, J., and Willis, J., concurred.