COURT OF APPEALS OF VIRGINIA


Present:    Judges Elder, Kelsey and McClanahan
Argued by teleconference


NORFOLK ADMIRALS AND
  FEDERAL INSURANCE COMPANY

                                                        MEMORANDUM OPINION* BY
v.        Record No. 0050-05-4                          JUDGE LARRY G. ELDER
                                                        NOVEMBER 1, 2005
TY A. JONES


FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

        Robert C. Baker, Jr. (Dobbs & Baker, on brief), for appellants.

        Benjamin T. Boscolo (W. David Falcon, Jr.; Chasen & Boscolo,
        P.C., on brief), for appellee.


        The Norfolk Admirals (employer) and Federal Insurance Company appeal a decision of

the Workers' Compensation Commission awarding benefits to Ty A. Jones (claimant).

Employer contends the commission erred in finding that:  (1) claimant sustained a compensable

injury by accident arising out of and in the course of employment while voluntarily engaging in a

fight; (2) claimant's disability was not cumulative; and (3) claimant was justified in failing to

market his residual capacity.  For the reasons that follow, we affirm the commission's decision.

I.

BACKGROUND

        On appeal from a decision of the commission, "we view the evidence in the light most

favorable to the prevailing party" and grant that party the benefit of all reasonable inferences.

Grayson Sch. Bd. v. Cornett, 39 Va. App. 279, 281, 572 S.E.2d 505, 506 (2002).

_____

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

So viewed, the record shows that on March 29, 2002, claimant, a right-hand-dominant, twenty-two-year-old male, was employed by the Norfolk Admirals as a hockey player, playing as a right-wing power forward. On that date, claimant took the ice and, following his coach's instructions, instigated a fight with an aggressive opposing player. As a result of the fight, claimant was sent to the penalty box, at which time he noticed that his right shoulder was sore and he could not lift his arm. At the end of the game, claimant went immediately to the team doctor to report the injury.

Following the injury, claimant took several days off with the agreement of employer's head athletic trainer, Kevin "Stu" Bender. Claimant's agent recommended that he not participate in the playoffs because he had been injured and did not yet have a contract for the 2002/2003 hockey season. Despite continuing problems, claimant played in the first round of the playoffs, but the team lost in that round, and the season ended on April 20, 2002.

On April 1, 2002, claimant sought treatment from Dr. R. Brick Campbell, an orthopedic surgeon "who worked with the employer's hockey team and supervised the employer's trainer, [Kevin "Stu"] Bender." Dr. Campbell recommended physical therapy, but when claimant's condition did not improve, Dr. Campbell ordered a right shoulder MRI, which was performed on April 24, 2002. As a result of the MRI, Dr. Campbell diagnosed lesions of the anterior, inferior, and posterior labrum.

On May 16, 2002, Dr. Campbell performed surgery on the claimant's right shoulder, which included the insertion of six screws. A copy of the operative report was provided to employer's head trainer, Stu Bender. Following the surgery, Dr. Campbell told claimant not to "bring" his shoulder "[past] probably 60 degrees up," to wear a sling for six months in order to let the shoulder heal, and to "take six months off" from work "and then see how it feels." Claimant wore the sling for "almost the full six months," taking it off only when he went to bed.

Dr. Campbell also prescribed an intensive "rehab protocol" and predicted claimant would be able to return to hockey on November 15, 2002.

By early June 2002, claimant returned home to Spokane, Washington. There, he came under the care of Physical Therapist Matthew Gores and Orthopedic Physician Russell VanderWilde, who helped him implement Dr. Campbell's rehab protocol. Gores agreed with Dr. Campbell's prognosis, opining that claimant's "[o]verall rehabilitation potential is excellent," and he recommended "skilled rehabilitative therapy in conjunction with a home exercise program," which was to last "until [claimant] reports for training camp." Claimant testified that he was "involved in rehab . . . five days a week . . . [so he] couldn't work during [the] period of time" through November 15, 2002. He admitted, however, that during the summer months, he was able to take a trip to Alaska, where he fished for "minor little fish" like "trout" and aggravated his shoulder injury while pushing himself out of a rental car. In mid-July, he reported doing "some putting and chipping," saying that "it went pretty good," but when he asked Dr. VanderWilde on July 19, 2002, if he could engage in such activities, Dr. VanderWilde "would not clear him for [such activities]" at that time. The record is silent as to whether claimant engaged in golf-related activities again prior to mid-September, when Dr. VanderWilde opined he could play golf.

Both Physical Therapist Gores and Dr. VanderWilde routinely provided copies of their office and progress notes to employer's head trainer, Stu Bender. Claimant and Gores remained in contact with Bender, who told claimant "to continue to take it really easy." Bender also gave advice on claimant's rehabilitation and the types of rehabilitation and leisure activities in which he thought claimant should or should not engage. Claimant's rehabilitation with Gores included range of motion work, strength training, and aerobic conditioning. When Dr. VanderWilde opined on August 30, 2002, that claimant could "play golf" and "start some stick work" "in a

- 3 -

non-contact situation" in mid-September, Bender "told [claimant] not to do these things yet." On September 27, 2002, Dr. VanderWilde noted that claimant "look[ed] good for return," but that he needed to "continue to work on his strengthening and then follow-up with Dr. Campbell prior to returning to competition in mid-November." On October 24, 2002, Physical Therapist Gores noted that he and claimant planned to review claimant's "workout book from the Blackhawks," and on November 4, 2002, claimant noted he had been trying to get in touch with Stu Bender and that he "need[ed] to be ready to fight" when he returned to the Admirals because "[t]hey have no toughness on the team."

Claimant continued to participate in rehabilitation through at least November 15, 2002. Dr. VanderWilde opined claimant was "totally disabled from professional hockey through that date," but said he still "anticipate[d]" that claimant "will return to his professional hockey career without any long-term restrictions." For reasons not apparent from the record, claimant did not return to play for the Norfolk Admirals and began to play for the Anchorage Aces in February 2003.

On the issue of causation, Dr. Campbell opined that the fight claimant participated in on March 29, 2002, materially aggravated a previous injury to the claimant's right shoulder. Dr. VanderWilde also opined that the treatment required for claimant's shoulder in 2002 was caused by his March 29, 2002 injury. Claimant acknowledged that he had pre-existing right shoulder problems but said that he had not suffered from any such problems during the three months prior to March 29, 2002 and that the type of pain he experienced after the fight on that date was more severe than any shoulder pain he had experienced previously.

Claimant sought medical and disability benefits, including temporary total disability for the period from April 20 through November 15, 2002. Following a hearing on June 1, 2004, the deputy awarded the requested benefits. He concluded claimant suffered an injury by accident

- 4 -

arising out of and in the course of his employment and that claimant was entitled to temporary total disability compensation through November 15, 2002, when claimant was released back to work as a hockey player.

On employer's request for review, the commission agreed with the deputy's conclusion that claimant's altercation during the March 29, 2002 hockey game arose out of and in the course of his employment and constituted an "accident" as contemplated by the Act. It also held credible evidence supported the finding that claimant in fact suffered an injury that "materially aggravated his pre-existing shoulder condition." Finally, on the issue of marketing, the commission held as follows:

> [W]e conclude that the claimant was not required to market any residual physical capacity that he may have had from May 16 to November 15, 2002, because of his profession as a hockey player and his reasonable belief that he would be able to return to that profession following his surgery. The record shows that claimant engaged in a strenuous rehabilitation program during the months following his surgery in an effort to return to his pre-injury job as a hockey player. The record also reflects that the claimant participated in this program at the direction of the employer's doctor, Dr. Campbell. Thus, given the unique circumstances of this case, we conclude that the claimant's need to concentrate on strengthening himself during the months following his shoulder surgery and preceding the next hockey season affected his capacity to find alternative employment from May 16 through November 15, 2002, and relieved him of any obligation of seeking alternative employment during this period as a condition of receiving disability compensation.

The commission affirmed the deputy's award of benefits, and this appeal followed.

II.

ANALYSIS

A.  Injury by Accident Arising Out of and in the Course of Employment

"In order to establish entitlement to compensation benefits, the claimant must prove, by a preponderance of the evidence, [(1)] an injury by accident which arose [(2)] out of and [(3)] in the course of his employment." Classic Floors, Inc. v. Guy, 9 Va. App. 90, 95, 383 S.E.2d 761, 764 (1989); see also Code § 65.2-101.  Employer argues that because claimant was the aggressor in voluntary combat, the injury did not arise out of his employment.  Claimant argues that he suffered an accidental injury as a result of a fight he engaged in at the instruction of his coach. He claims that fighting is a part of the history and game of hockey and that it constitutes a hazard to which he was exposed to a degree beyond that of the public at large.

1.  Injury by Accident

Employer argues that intentional actions by any design are not accidental and, thus, are not compensable.  The Workers' Compensation Act does not define "injury by accident."  That phrase, however, has been defined by judicial interpretation.  In Southern Express v. Green, 257 Va. 181, 509 S.E.2d 836 (1999), the Supreme Court stated that,

> to establish an "injury by accident" a claimant must prove (1) that the injury appeared suddenly at a particular time and place and upon a particular occasion, (2) that it was caused by an identifiable incident or sudden participating event, and (3) that it resulted in an obvious mechanical or structural change in the human body.

Id. at 187, 509 S.E.2d at 839.  Here, the commission found evidence to support these factors, and we agree.

The particular time, place, and occasion of claimant's injuries was at the conclusion of a fight during the hockey game in which claimant played on March 29, 2002.  The identifiable or precipitating event was the fight, which claimant instigated with a player on the opposing team

- 6 -

on the instructions of his coach.  Finally, claimant's doctor stated that the fight "materially aggravated" claimant's right shoulder injury, causing lesions of the anterior, inferior, and posterior labrum of the right shoulder, which indicates a mechanical or structural change that resulted in his injury.  Thus, credible evidence supports the commission's finding that claimant sustained an injury by accident within the meaning of the Act rather than an impairment resulting from cumulative trauma.

### 2.  Arising out of Employment

The Supreme Court defined "arising out of employment" in Combs v. Virginia Electric & Power Co., 259 Va. 503, 525 S.E.2d 278 (2000).  "In Virginia we apply an 'actual risk test,' meaning that the employment must expose the employee to the particular danger causing the injury, notwithstanding the public's exposure generally to similar risks."  Id. at 510, 525 S.E.2d at 282.  In cases of assault, the motive of the actor committing the assault is also examined.  See Hopson v. Hungerford Coal Co., 187 Va. 299, 307, 46 S.E.2d 392, 396 (1948); Farmers Mfg. Co. v. Warfel, 144 Va. 98, 101-02, 131 S.E. 240, 241 (1926).  "[I]f there is a causal connection between [the] injury and the conditions of [the claimant's] employment, then [the] injury arose out of [that] employment."  Combs, 259 Va. at 509, 525 S.E.2d at 282.

In Pro-Football v. Uhlenhake, 37 Va. App. 407, 558 S.E.2d 571 (2002), aff'd, 265 Va. 1, 574 S.E.2d 288 (2003), this Court affirmed the commission's decision to award benefits to a professional football player because the player's injuries resulted from, or were hastened by, the conditions of his employment, which exposed him to hazards to a degree beyond that of the public at large.  Pro-Football argued, as employer argues here, that the claimant was seeking to recover for injuries resulting from voluntary participation in activities.  However, the Court found, as the commission in this case found, that claimant was engaged in an activity that was required by his employment.  Id. at 413, 558 S.E.2d at 574-75.

Indeed, in the case at bar, the evidence established that, at the time claimant was injured, he was performing a task that he was employed to perform. The commission found that fighting is an integral part of the game of hockey and that claimant's job on employer's hockey team was to be an "enforcer." This conclusion was supported by the deposition testimony of Lawrence J. Landon, Executive Director of the Professional Hockey Players' Association, who stated fighting is a part of hockey and is not prohibited by the league. He testified that the league rule on fighting is just a "policing mechanism or control mechanism because [fighting] is allowed." He said, "All fighting is part of the game." He also testified that, in fighting, claimant was doing what he was paid to do; that injury due to fighting is a foreseeable risk for any player in any game; and that games without fighting are the exception rather than the rule. The evidence also included claimant's testimony that his coach told him to "go get" a particular player on the opposing side, which claimant understood to mean, "go fight him." Although employer argues that claimant's fighting constituted willful misconduct, employer failed to rebut the evidence that fighting was a part of claimant's employment.[1]

Employer argues that the commission engaged in overreaching and improperly took judicial notice in finding that fighting is a part of the game of hockey. We disagree. No judicial notice was taken. The commission considered the ample evidence before it on the issue of

---

[1] Code § 65.2-306 provides that no compensation shall be awarded to a claimant for an injury caused by: "1. The employee's willful misconduct or . . . 2. The employee's attempt to injure another . . . ." Commission Rule 1.10 requires that an employer intending to rely upon a willful misconduct defense pursuant to Code § 65.2-306 shall notify the employee and the commission no later than 15 days prior to the hearing and provide "a statement of the particular act relied upon as showing willful misconduct." This is an affirmative defense, imposing upon the employer the burden of proving that claimant's conduct, which caused his injury, was in willful disregard of a reasonable rule established by employer. Code § 65.2-306(B); see also Brockway v. Easter, 20 Va. App. 268, 271, 456 S.E.2d 159, 161 (1995). Although employer contends that claimant was engaged in willful misconduct, it did not raise or rely on Code § 65.2-306 and failed to rebut the evidence that claimant was engaged in an activity required by his employment when he was injured.

fighting in hockey. The evidence supports the commission's decision that claimant's injury can fairly be traced to his employment as a contributing proximate cause. "[W]hether an employee is guilty of willful misconduct and whether such misconduct is a proximate cause of the employee's accident are issues of fact." Brockway v. Easter, 20 Va. App. 268, 272, 456 S.E.2d 159, 161 (1995). Although claimant conceded that fighting is voluntary and that he instigated the fight, the fight was not a personal undertaking but instead was directed against the other player as part of claimant's employment relationship and in furtherance of employer's business. Compare Richmond Newspapers, Inc. v. Hazelwood, 249 Va. 369, 374-75, 457 S.E.2d 56, 59 (1995) (holding that "goosing" of fellow newspaper employee constituted an assault that "was of a personal nature and not directed against the recipients as employees or in furtherance of the employer's business" and that resulting injury thus did not arise out of employment).

### 3. In the Course of Employment

The phrase, "in the course of employment," means that the injury took place "'within the period of employment, at a place where the employee may reasonably be, and while he is reasonably fulfilling duties of his employment or engaged in doing something incidental thereto.'" Combs, 259 Va. at 511, 525 S.E.2d at 283 (quoting Bradshaw v. Aronovitch, 170 Va. 329, 335, 196 S.E. 684, 686 (1938)). Claimant's injury occurred while he was employed as a hockey player, during a hockey game, and while he followed his coach's orders. Thus, ample evidence supported the commission's finding that claimant was injured in the course of his employment.

### B. Cumulative Trauma versus Injury Aggravating Pre-Existing Condition

Employer argues that claimant's injury was a result of cumulative trauma and, therefore, is not compensable. However, "[w]hen an injury sustained in an . . . accident accelerates or aggravates a pre-existing condition, death, or disability resulting therefrom is compensable under

- 9 -

the Workers' Compensation Act." Ohio Valley Constr. Co v. Jackson, 230 Va. 56, 58, 334 S.E.2d 554, 555 (1985); see also Lilly v. Shenandoah's Pride Dairy, 218 Va. 481, 488, 237 S.E.2d 786, 790 (1977). The commission relied on the diagnosis of Dr. Campbell, who stated that the injury claimant sustained in the March 29, 2002 fight "materially aggravated" a previous injury. It also relied on the statement of Dr. VanderWilde that claimant's need for treatment was necessitated by his March 29, 2002 shoulder injury. Finally, it relied upon claimant's testimony that, although he had a pre-existing shoulder injury, he had not experienced any problems with his shoulder during the three months prior to March 29, 2002 and that the pain he suffered after the March 29, 2002 fight was more severe than any of the pain he had experienced previously. Therefore, the record contains credible evidence to support the commission's finding that claimant suffered an injury to his right shoulder during the fight on March 29, 2002 that "materially aggravated his pre-existing shoulder condition."

### C. Residual Work Capacity

Employer also argues that the commission erred in finding claimant was not required to market his residual work capacity. An employee claiming entitlement to temporary total disability benefits must take reasonable measures to market any residual work capacity he may have. Great Atl. & Pac. Tea Co. v. Bateman, 4 Va. App. 459, 464, 359 S.E.2d 98, 101 (1987). "[I]t is not required that a workers' compensation claimant who suffers partial disability be informed by his physician that he may undertake restricted work in order for him to be obligated to make reasonable efforts to market his residual skills." Ridenhour v. City of Newport News, 12 Va. App. 415, 416, 404 S.E.2d 89, 89 (1991).

To determine the reasonableness of an employee's efforts to market, the commission should consider

> (1) the nature and extent of employee's disability; (2) the employee's training, age, experience, and education; (3) the nature

- 10 -

and extent of employee's job search; (4) the employee's intent in conducting his job search; (5) the availability of jobs in the area suitable for the employee, considering his disability; and (6) any other matter affecting employee's capacity to find suitable employment.

Nat'l Linen Serv. v. McGuinn, 8 Va. App. 267, 272, 380 S.E.2d 31, 34 (1989). "What is reasonable in one area, or in one industry, or even in one season might not be reasonable in another. . . . [W]hat is reasonable in a given case will depend upon all of the facts and surrounding circumstances." Bateman, 4 Va. App. at 467, 359 S.E.2d at 102. Ultimately, "[t]he commission . . . determines which of these or other factors are more or less significant with regard to a particular case." McGuinn, 8 Va. App. at 272-73, 380 S.E.2d at 34-35. We treat the commission's factual determinations as binding if supported by credible evidence. Code § 65.2-706(A); Wall Street Deli v. O'Brien, 32 Va. App. 217, 220-21, 527 S.E.2d 451, 453 (2000).

In this case, the commission concluded that claimant was not required to market his residual physical capacity during the benefit period. The commission found that although claimant clearly was capable of "rather significant physical activity" in the months following his surgery, employer's physician, Dr. Campbell, prescribed an intensive "rehab protocol" designed to return claimant to his pre-injury position as a professional hockey player within six months of his May 16, 2002 shoulder surgery. Physical Therapist Gores and Orthopedic Physician VanderWilde, who oversaw claimant's rehabilitation when he returned to his home in Spokane, Washington, in late May or early June 2002, both also opined that claimant's prognosis for recovery was "excellent" and that he likely would be able to return to his position as a professional hockey player within the time frame given by Dr. Campbell. Compare Bateman, 4 Va. App. at 465-66, 359 S.E.2d at 101-02 (holding employee had duty to market residual capacity by seeking new employment where he had received permanent partial impairment rating

- 11 -

to injured leg and physician expressly advised him to seek a new, preferably sedentary, position).[2] Although claimant experienced some minor setbacks, he progressed toward Dr. Campbell's rehabilitative goal in a reasonably timely fashion. During this time, employer's head trainer, Stu Bender, maintained contact with claimant and monitored claimant's participation in Dr. Campbell's rehab protocol. Bender told claimant "to continue to take it really easy" and gave advice on the types of rehabilitation and leisure activities in which he thought claimant should or should not engage. Finally, claimant testified that he participated in Dr. Campbell's rehabilitation protocol five days per week and that the level of his participation prevented him from seeking or performing other employment during the period at issue.[3]

Thus, evidence of claimant's prognosis for a full recovery prior to the next hockey season, combined with evidence of the intensity of his "rehab protocol" and the level of involvement of employer's agents in overseeing the rehabilitative process, constitute credible evidence supporting the commission's finding that claimant had no duty to market his residual capacity under the unique facts of this case.

---

[2] The dissent cites Hall v. C.R. Hudgins Plating, Inc., 70 O.I.C. 237, 239 (1991), for the proposition that a "claimant's anticipation of returning to employment is not sufficient justification for failing to market remaining work capacity." Hall is factually distinguishable in that Hall returned to work in a light-duty position for her pre-injury employer, lost her job in an economic layoff, and then failed to market her residual capacity while her doctor continued to recommend light-duty work.

[3] The dissent cites Knott v. Hampton Roads Mariners, L.L.C., 2005 VA Wrk. Comp. LEXIS 242 (2005), as a case in which the commission "den[ied] benefits to a professional soccer player who did not adequately market his residual capacity." Knott is factually distinguishable in that, although the claimant underwent physical therapy, no evidence indicated the claimant's physicians prescribed intensive, time-consuming rehabilitation that prevented him from working or that his employer anticipated Knott would return to his pre-injury employment for employer. Further, the evidence indicated that Knott testified he was a college graduate with a degree in physics and that he actually looked for work, although he kept no records of the potential employers he contacted.

III.

Because credible evidence supports the commission's decision that claimant sustained a compensable injury by accident arising out of and in the course of employment, that his disability was not cumulative, and that he had no duty to market his residual capacity under the unique facts of this case, we affirm the commission's award.

Affirmed.

McClanahan J., concurring, in part, and dissenting, in part.

I concur in Parts II A and B of the majority opinion. However, I would reverse and vacate the commission's award of temporary total benefits from May 16 to November 15, 2002, because there is no credible evidence that the claimant made any effort to market his residual work capacity.

A claimant seeking temporary total disability benefits, while unable to perform the job at which he was injured, may still possess an ability to perform some kind of employment, rendering him only partially incapacitated. In its decision, the commission concluded "that th[is] claimant was not completely incapacitated from the time of his surgery on May 16, 2002, until November 15, 2002." It found that

> the evidence clearly shows that the claimant was capable of performing rather significant physical activity during the months following his surgery – as reflected by his ability to go fishing in August of 2002, the type of physical activity he performed when engaging in Dr. Campbell's "rehab protocol," and Dr. VanderWilde's opinion that the claimant would be capable of shooting on the ice by mid-September 2002.

Neither party contested the commission's finding that claimant was partially incapacitated.

In order to establish his entitlement to benefits, a partially incapacitated claimant must prove that he made a reasonable effort to market his residual work capacity. See Washington Metropolitan Area Transit Authority v. Harrison, 228 Va. 598, 601, 324 S.E.2d 654, 656 (1985); Island Creek Coal Co. v. Fletcher, 201 Va. 645, 648, 112 S.E.2d 833, 835 (1960); see also Great Atl. & Pac. Tea Co. v. Bateman, 4 Va. App. 459, 464, 359 S.E.2d 98, 101 (1987) (An employee claiming entitlement to temporary total benefits must take reasonable measures to secure suitable work.). [4] The commission also acknowledged this legal principle applied in this case.

---

[4] Generally, there are only three exceptions to the duty to market, and none of these exceptions apply in this case. First, if the claimant is totally disabled, he does not have any residual capacity to market. See e.g., Georgia Pac. Corp. v. Dancy, 17 Va. App. 128, 134, 435

In spite of finding that the claimant was only partially incapacitated and was "capable of performing rather significant physical activity," the commission then inconsistently concluded "that the claimant was not required to market any residual capacity that he may have had from May 16 to November 15, 2002, because of his profession as a hockey player and his reasonable belief that he would be able to return to that profession following his surgery." I am not aware of any exception in the law that a person in professional sports is not required to market, see Knott v. Hampton Roads Mariners, L.L.C., 2005 VA Wrk. Comp. LEXIS 242 (2005) (denying benefits to a professional soccer player who did not adequately market his residual work capacity), even if he reasonably believes that he may be able to return to his profession, see Hall v. C.R. Hudgins Plating, Inc., 70 O.I.C. 237, 239 (1991) (holding that claimant's anticipation of returning to employment is not sufficient justification for failing to market remaining capacity to work). As a matter of law, a claimant who is partially incapacitated has the burden of proving that he made a reasonable effort to market his residual work capacity. Harrison, 228 Va. at 601, 324 S.E.2d at 655.

Once it is determined that the claimant is required to market, then the commission must determine whether the steps the claimant took to find alternative employment were reasonable, using the factors set forth in Nat'l Linen Serv. v. McGuinn, 8 Va. App. 267, 380 S.E.2d 31 (1989).

> [I]n defining what would be considered a reasonable effort at
> obtaining employment . . . the employee must present "some
> evidence that he had engaged in a good faith effort to obtain work
> within the tolerance of his physical condition" and has failed to

S.E.2d 898, 901 (1993). Second, if the claimant is under a *de facto* award, where the employer is paying the claimant and, thus, is not contesting the compensability of the claim, the claimant is under no obligation to market. See Nat'l Linen Serv. v. McGuinn, 5 Va. App. 265, 272, 362 S.E.2d 187, 190 (1987) (*en banc*). Or, third, if the claimant is seeking benefits for such a brief period of time (i.e., days or weeks, not months), that it makes no sense to require him to market, he is not required to do so. Holly Farms Foods, Inc. v. Carter, 15 Va. App. 29, 42, 422 S.E.2d 165, 172 (1992).

> find a job, either due to his injury or because no such work was available in the community.

Id. at 271, 380 S.E.2d at 33-34 (quoting Dunkin Donuts of Am., Inc. v. Watson, 366 A.2d 1121 (Me. 1976)). In this case, it is clear from the record, and uncontested, that the claimant did not make *any* effort to obtain work within the tolerance of his physical condition. "Inasmuch as the record establishes an absence of effort on his part, it fails to support the commission's finding that his efforts were reasonable." Wall St. Deli, Inc. v. O'Brien, 32 Va. App. 217, 221, 527 S.E.2d 451, 453 (2000); see also Bateman, 4 Va. App. at 468, 359 S.E.2d at 103 (reversing an award where "[n]o effort was made to secure any sedentary job or position for which [claimant] was equipped"). Instead, the commission concluded that:

> the claimant's need to concentrate on strengthening himself during the months following his shoulder surgery and preceding the next hockey season affected his capacity to find alternative employment from May 16 through November 15, 2002, and relieved him of any obligation of seeking alternative employment during this period as a condition of receiving disability compensation.

Such a conclusion clearly rests on factor (6) of the McGuinn factors: "(6) any other matter affecting employee's capacity to find suitable employment." McGuinn, 8 Va. App. at 272, 380 S.E.2d at 34. The McGuinn factors have historically been used to determine reasonableness of a claimant's efforts, but in this case of "unique circumstances," they are being used to create a legal exception to the duty to market. Such an application of the factors negates the duty to market requirement and creates an exception that swallows the rule. Cf. Anzualda v. Commonwealth, 44 Va. App. 764, 774 n.3, 607 S.E.2d 749, 754 n.3 (2005); Jenkins v. Ford Motor Co., 27 Va. App. 281, 293, 498 S.E.2d 445, 451 (1998). Furthermore, since most injuries will require some rehabilitation, it is hard to imagine a set of facts that could not somehow fit into the exception; as long as a claimant says he is spending a significant portion of his time in rehabilitation, he is now excused from any duty to market.

Moreover, this case presents no "unique circumstances" that justify an exception to claimant's legal duty to market. The fact that "claimant engaged in a strenuous rehabilitation program during the months following his surgery in an effort to return to his pre-injury job as a hockey player," is not enough as a matter of law. Rehabilitation is often strenuous, but it does not obviate a claimant's duty to market. As the commission has previously explained, "[s]pending several hours in physical therapy each week does not relieve a claimant of his burden to market his residual capacity." Baker v. Virginia Forklift, Inc., 2003 VA Wrk. Comp. LEXIS 1340 (2003).

While this Court will not disturb the commission's factual findings if based on credible evidence, "[w]hether credible evidence exists to support a factual finding is a question of law which is properly reviewable on appeal." Hercules, Inc. v. Gunther, 13 Va. App. 357, 361, 412 S.E.2d 185, 187 (1991). In this case, the medical evidence shows that claimant was required to attend rehabilitative therapy variously from two to three times a week, with treatment lasting 13 to 50 minutes per day (consisting of 39 visits) over a seven-month period, in conjunction with a daily home exercise program.[5] There is absolutely no evidence regarding how much time each day he spent exercising at home, as prescribed. Cf. Dennis v. Inglett & Stubbs, Inc., 2001 VA Wrk. Comp. LEXIS 4280 (2001) (holding that a claimant did not sufficiently market his residual capacity when evidence showed that claimant's therapy took approximately thirty minutes, three days a week). All the record shows is claimant's conclusory response that he was involved in rehabilitation five days a week and "couldn't work during that period of time."

It was claimant's burden to prove why he could not work, which he did not do. See Dennis, 2001 VA Wrk. Comp. LEXIS 4280 (explaining that "claimant offered no

---

[5] Of the 39 visits, there were four visits where no rehabilitative treatment was noted. No documentation for Visit 2 existed in the record.

evidence why he could not arrange physical therapy either prior to or after work hours" and that his "mere assertion that he could not be employed because of the physical therapy, without evidence of actually seeking employment, is not sufficient to establish marketing of his remaining capacity"). There was simply no credible evidence for the commission's decision; and, likewise, no factual basis for the majority's conclusion that "the level of [claimant's] participation [in rehabilitation] prevented him from seeking or performing other employment during the period at issue." Even under the commission's own precedent, albeit an extreme example, if claimant was free to market his residual capacity only one hour a day, he was obligated to do so, even if it was "highly unlikely [he] could actually find work." Pilson v. J. D. Bassett Mfg. Co., VWC 191-18-35 (July 27, 2000) (ruling that under Virginia law, the claimant, a manufacturing laborer, who was released to work one hour a day with the use of only one hand, was required to "at least attempt to market [her] residual capacity").

The commission's own precedent belies any conclusion that this case presents "unique circumstances" negating the legal duty to market. Claimant failed to meet his burden of proving that he made a reasonable effort to market his remaining work capacity. I would hold that "no effort" is not sufficient to satisfy the requirement that a claimant make a "reasonable" effort. Accordingly, I would reverse the decision of the commission on that issue.